## TRANS-LUX CORPORATION *v.* JAMES F. MEEHAN, COMMISSIONER OF REVENUE SERVICES

SUPERIOR COURT      TAX SESSION      FILE NO. 384914

Memorandum filed December 3, 1993

*Day, Berry & Howard,* for the plaintiff.

*Richard K. Greenberg,* assistant attorney general, with whom was *Richard Blumenthal,* attorney general, for the defendant.

## I

### INTRODUCTION

BLUE, J. Business is no respecter of state boundaries, but the tax law sometimes is. In this appeal, I am called upon to determine the tax consequences of a sale of corporate stock that occurred in the context of an intricate multistate corporate structure. In making this determination, I am called upon to construe two different Connecticut statutes.

This is an appeal, pursuant to General Statutes § 12-237, of a revised assessment by the commissioner of revenue services attributes the gain on a $14 million transaction in 1986 to a parent corporation.

It is conceded that the appeal was timely filed and that I have jurisdiction. I conducted an evidentiary hearing on September 29, 1993. (Historians may wish to note that this was the first evidentiary hearing held in the Tax Session of the Superior Court.) My findings of fact and conclusions of law are as follows.

## II

### Findings of Fact

This case involves Trans-Lux Corporation (hereinafter referred to as "Trans-Lux") and some of its many subsidiaries. Trans-Lux has a colorful history, and the issues here are in large part rooted in this historical background. Trans-Lux was incorporated in Delaware in 1920. It was founded on a single invention: that of rear-screen projection.

As anyone who goes to the movies knows, motion pictures have traditionally been shown with front-screen projection, that is, the images are cast upon the screen by a projector in front of the screen. This method has several advantages, but it also has two disadvantages. The lights must be turned off for the movie to be seen, and shadows can be cast on the screen. Rear-screen projection, in contrast, comes from the rear of the screen (somewhat in the fashion of television). It can be seen with the lights on, and shadows cannot be cast on the screen.

Rear-screen projection was originally used by a retired English adventurer who loved to show his travel slides in a fully-lit room that allowed his audience to simultaneously gaze upon both his slides and his own handsome features. This use was of limited economic value. The first economically viable use of the technology came in 1924. The founder of Trans-Lux went to the New York Stock Exchange and saw that so many stockbrokers were crowding around the stock ticker

that only the biggest and strongest could get through. The ninety-eight pound weaklings were kept away from the ticker by their burlier counterparts. With rear-screen technology, however, the stock prices could be shown on the wall in a fully-lit room for all to see. With this profitable use, Trans-Lux became heavily involved in what might be called the communications industry.

Shortly after this, another profitable use for rear-screen projection was discovered. It could be used in the actual production of motion pictures. In filming a car-chase scene, for example, it is helpful if the car being filmed is actually stationary, and the background behind it appears to move. If front-screen projection is used, however, the actors will cast their shadows on the background. (One can occasionally see this in some early films.) Rear-screen projection solves this problem.

With this use, Trans-Lux became involved in the movie business. The next step was to build rear-screen projection theaters. These theaters could show news-reels while the audience was ambling in to watch the feature attraction. (The lights were not turned off until the feature film began.) Trans-Lux built a number of these theaters, and (this is important) separate corporations were created for each theater. The theaters were originally owned fifty–fifty by Trans-Lux and RKO, but RKO went bankrupt in 1935, and Trans-Lux suddenly had a string of movie theaters. (A famous *New Yorker* cartoon of this period showed a group of wealthy individuals "going to the Trans-Lux to hiss Roosevelt.")

In the 1940s, newsreels began to disappear with the advent of television. At the same time, front-screen projectors began to be able to show things like Cinema-scope that rear-screen projectors could not. Trans-Lux changed all of its theaters to front-screen projection. One consequence of this was that its communications

division now used a technology completely different from that of its entertainment division. Below the level of top management, these became completely separate divisions.

The business offices of Trans-Lux were initially located in New York City. In 1970, however, Trans-Lux moved its communications factory to Connecticut. Over the next fourteen years, more and more Trans-Lux employees were transferred to Connecticut, and in 1984, the entire communications division moved to Connecticut.

The entertainment division, however, remained in New York. This was necessary, in terms of the day-to-day operations, because New York (unlike any city in Connecticut) is an "exchange city." The sales offices of studios are called "exchanges," and if one is going to obtain movies from studios for showing in theaters, one must, as a practical matter, do so in a city such as New York or Los Angeles containing these exchanges. Consequently, all Trans-Lux employees who did things like view, lease, and publicize the movies did so out of New York both before and after the communications division moved to Connecticut.

It is thus fair to say that, in terms of their everyday operations, the communications and entertainment divisions of Trans-Lux were divided, with the entertainment division in New York and the communications division in Connecticut. At the level of top management, however, this division did not exist. There was a single board of directors for the entire corporation, a single chief executive officer, a single chief of operations, and a single chief fiscal officer. The board and the chief officers just named essentially straddled both divisions and worked in both states. These were the people who exercised management and control over Trans-Lux's subsidiary corporations. The corporate

headquarters were, however, in Connecticut. In 1986, which is the year in question here, most (but not all) of the board meetings were in Connecticut.

The corporate structure of Trans-Lux must now be described. In the mid-1980s, Trans-Lux owned fifteen or sixteen theaters, nine of which were located in Connecticut. As already mentioned, each individual theater had its own corporation. The board members and officers of the individual theater corporations were board members and top management of the parent company, Trans-Lux. The stock of these individual corporations was originally owned by a holding company called Trans-Lux Theaters Corporation (which, in turn, had been a wholly owned subsidiary of Trans-Lux). The Theaters Corporation became defunct in the 1960s, after which the individual theater corporations became wholly-owned subsidiaries of Trans-Lux.

In 1983, top management of Trans-Lux decided to create another holding corporation for the theaters. The primary reason for this was the limitation of liability. Thus it was that Trans-Lux Texas Corporation ("T-L Texas") was born. The board meeting that authorized this was held in Connecticut. T-L Texas was, as the name implies, a Texas corporation. Its function was to own all of the stock of the individual theater corporations, and it, in turn, was a wholly-owned subsidiary of Trans-Lux. The board members and officers of T-L Texas were all board members and officers of Trans-Lux. T-L Texas had no separate recognizable existence. It had no office and no employees, and its board meetings were held in conjunction with the board meetings of Trans-Lux.

In 1986, Richard Brandt, then the chief executive officer of Trans-Lux, received an unsolicited offer of staggering generosity from Gulf & Western Inc., the parent corporation of Paramount Pictures. The price of a

movie theater had traditionally been five times earnings. By the mid-1980s, this had increased to ten times earnings. After some negotiation, Gulf & Western offered to purchase ten of Trans-Lux's theaters for the then-record price of fifteen times earnings. Eight of the ten theaters to be sold were in Connecticut, one was in New York City, and one was in Oklahoma. Brandt and the board decided to accept this offer.

In order to accommodate this sale, yet another corporation was born. Trans-Lux Investment Corporation ("T-L Investment") was created shortly before the sale as a wholly-owned subsidiary of Trans-Lux, which, in turn, owned all of the stock of T-L Texas. On the eve of the sale, therefore, the corporate structure of Trans-Lux could be schematically represented as follows:

(Individual theater corporations)

On June 25, 1986, the board of T-L Texas met, according to its minutes, "in the Board Room of the Corporation, 110 Richards Avenue, Norwalk, Connecticut" and authorized "the sale of the stock of ten of its theater subsidiaries to an affiliate of Gulf & Western Inc. for an aggregate purchase price of $14,700,100." The proceeds were to be paid to T-L Investment and were then available to both divisions of Trans-Lux. It is of the utmost importance that this was a sale of stock and not a sale of assets.

The sale occurred as planned, and the tax consequences of the sale are the subject of this case. When

Trans-Lux filed its 1986 Connecticut return, it did not report this income at all. (There is no suggestion of fraud in this, since Trans-Lux did not file a combined return.) When Trans-Lux was audited by the commissioner, however, the commissioner asserted his authority under General Statutes § 12-226a to "adjust" the income of Trans-Lux to reflect the sale. In doing so, moreover, the commissioner construed General Statutes § 12-218 so as to apportion the entire gain from the sale (that is, the gain from the sale of all ten theater corporations) to Connecticut. Trans-Lux has appealed the resulting deficiency assessment to this court.

## III

### CONCLUSIONS OF LAW

Trans-Lux has challenged the assessment of deficiency on two different statutory grounds. First, Trans-Lux claims that the adjustment was not, in fact, authorized by § 12-226a. Second, Trans-Lux argues that, even if § 12-226a was properly invoked, that the gain from the sale cannot be apportioned to Connecticut under § 12-218. These arguments will be considered in turn.

### A

### SECTION 12-226A

It has long been established that a state may tax the apportioned net income of a domestic or foreign corporation that conducts a unitary business "which is scattered through several States." *Butler Bros.* v. *McColgan,* 315 U.S. 501, 508, 62 S. Ct. 701, 86 L. Ed. 991 (1942). Once it is accepted that a state may tax the income of a single corporation with branches in several states, there is no principled reason to reach a different result in the case of a parent corporation owning and controlling as units of one system branches organized as subsidiary corporations in several states. *Edison California Stores, Inc.* v. *McColgan,* 30 Cal. 2d

472, 480, 183 P.2d 16 (1947). "The only difference between the two cases lies in the form of business organization, that is, the organization of a business enterprise through subsidiaries, as distinguished from branches, a factor that should not affect State tax apportionment." 1 J. Hellerstein & W. Hellerstein, State Taxation (2d Ed. 1993) ¶8.12, p. 8-99. The principles of taxation in this area "should depend on something more than manipulations of corporate structure." *Allied-Signal, Inc.* v. *Director, Division of Taxation,* 504 U.S. 768, 112 S. Ct. 2251, 2265, 119 L. Ed. 2d 533 (1992) (O'Connor, J., dissenting).

Different states address the problem of taxing multicorporate enterprises in different ways. Connecticut's approach is set forth in § 12-226a, which provides, in relevant part, as follows: "If it appears to the commissioner of revenue services that any agreement, understanding or arrangement exists between the taxpayer and any other corporation or any person or firm, whereby the activity, business, income or capital of the taxpayer within the state is improperly or inaccurately reflected, the commissioner of revenue services is authorized and empowered, in his discretion and in such manner as he may determine to adjust items of income, deductions and capital, and to eliminate assets in computing any apportionment percentage under this chapter, provided any income directly traceable thereto shall also be excluded from entire net income, so as equitably to determine the tax."

Although § 12-226a was enacted in 1973; see Public Acts 1973, No. 73-350, § 20; it has not been the subject of judicial construction in any published case. Such construction is now necessary, for the parties view the statute in dramatically different ways. Trans-Lux argues that the statute must be narrowly construed as a tax imposition statute and implemented only in cases of real impropriety. Essentially, Trans-Lux would limit

its use to tax-avoidance schemes. The commissioner, on the other hand, views the statute broadly. Pointing to the statute's broad, discretionary language, the commissioner argues that his use of the statute is reviewable only by the abuse of discretion standard familiar to other areas of administrative law.

A number of factors must be considered in construing the statute, and not all of them point in the same direction. On the taxpayer's side, to begin with, I am persuaded that § 12-226a is indeed a tax imposition statue, as distinct from a tax exemption statute, and therefore any ambiguity in the statute must be resolved in favor of the taxpayer. It is true that § 12-226a does not itself impose a tax but, rather, provides a mechanism whereby the taxing provisions of other statutes may be imposed. It is also true that, by its own terms, § 12-226a allows deductions as well as items of income to be adjusted and could conceivably allow exemptions as well as income to be added up in the taxpayer's favor. On the other hand, § 12-226a is a tool available only to the commissioner, and the likelihood that the commissioner would use this tool to calculate a net decrease in taxable income can safely be regarded as de minimus.

In any event, the logic of *Altray Co.* v. *Groppo*, 224 Conn. 426, 619 A.2d 443 (1993), is controlling on this point. *Altray* construed § 12-218, the apportionment statute. Section 12-218, like § 12-226a, is not itself a "taxing" statute. Id., 431–32. Moreover, § 12-218, much more emphatically than § 12-226a, operates (by the process of apportionment) "to exclude from taxation a portion of corporate income otherwise subject to § 12-214." Id., 433. Nevertheless, the Supreme Court found § 12-218 to be a tax imposition statute for statutory construction purposes. It reasoned that § 12-218, while not a taxing statute, "provides the criteria and formulae for determining net income subject to the state's corporation tax." Id., 432. It further reasoned

that, "[b]ecause § 12-218 is an integral component of this state's tax imposition scheme . . . it cannot properly be characterized as a statute providing a taxpayer exemption." (Citation omitted.) Id., 433. Because these same characteristics inhere in § 12-226a, I conclude that § 12-226a must similarly be construed as a tax imposition statute.

Viewing § 12-226a as a tax imposition statute, however, does not mean that the construction contended for by the taxpayer here is correct. There are, as indicated, other factors that must now be considered. One factor is the plain meaning of the words used in the statutory text. The other is the construction given to substantially similar statutes by the courts of other jurisdictions.

"[C]ourts must construe statutory provisions as they are written . . . and in a manner so as to give effect to the apparent intent of the legislature." (Citations omitted.) *Zachs* v. *Groppo,* 207 Conn. 683, 690, 542 A.2d 1145 (1988). Section 12-226a is plainly written in a way that gives the commissioner a great deal of discretion in making adjustments between related corporations. The commissioner's powers under this statute may be invoked if it "appears" to him that "any" corporate arrangement exists whereby the taxpayer's income is improperly or inaccurately reflected. If the commissioner detects such an "appearance," he is "authorized and empowered, in his discretion and in such manner as he may determine" to make adjustments. Language that would more expressly give the commissioner vast discretion is difficult to imagine. Thus, in spite of the fact that this is a tax imposition statute, a narrow construction against the commissioner would be linguistically anomalous (how does one "narrowly" construe the phrase "in his discretion and in such manner as he may determine"?) and would thwart the obvious intent of the legislature.

Trans-Lux, casting about for words to construe narrowly, has seized upon the phrase "improperly or inaccurately reflected." That, in its view, is a sign that the commissioner's discretionary powers cannot be implemented in the absence of some real impropriety. I do not agree that this is a fair reading of the statutory text—income may be "inaccurately reflected," for example, without any impropriety at all—but I do not, in any event, write on an altogether clean slate. Judicial authority from other jurisdictions construing substantially similar statutory language, while not technically binding, persuades me that the taxpayer's view should not be adopted.

Section 12-226a is virtually identical to the adjustment provision contained in N.Y. Tax Law § 211 (5) (Consol. 1990).[1] "The fact that a statute is almost a literal copy of a statute of a sister state is persuasive evidence of a practical reenactment of the statute of the sister state; as such it is proper to resort to the decisions of a sister court construing that statutory language." *State* v. *Elliott,* 177 Conn. 1, 5, 411 A.2d 3 (1979). In discussing the decisions of the New York courts concerning § 211 (5) it is helpful to describe briefly the statutory history of the New York provision. This is particularly so because of the fact that the Connecticut legislature, in choosing to adopt § 211 (5),

---

[1] N.Y. Tax Law § 211 (5) (Consol. 1990) now provides, in relevant part: "In case it shall appear to the tax commission that any agreement, understanding or arrangement exists between the taxpayer and any other corporation or any person or firm, whereby the activity, business, income or capital of the taxpayer within the state is improperly or inaccurately reflected, the tax commission is authorized and empowered, in its discretion and in such manner as it may determine, to adjust items of income, deductions and capital, and to eliminate asets in computing any allocation percentage provided only that any income directly traceable thereto be also excluded from entire net income, minimum taxable income or pre-nineteen hundred ninety minimum taxable income, so as equitably to determine the tax."

chose not to adopt a different but related provision of corporate tax law contained in N.Y. Tax Law § 211 (4) (Consol. 1990).[2]

The original antecedent of both New York tax code provisions—i.e. § 211 (4) and (5)—was enacted by 1920 N.Y. Laws c. 640, § 9. Under the 1920 law, any corporation owning or controlling substantially all of the stock of another corporation "liable to report under this article" could be "required to make a consolidated report showing the combined entire net income" of both corporations. In *People ex rel. Studebaker Corp.* v. *Gilchrist,* 244 N.Y. 114, 121, 155 N.E. 68 (1926), the Court of Appeals of New York, in an opinion by Cardozo, J., construed this provision to apply only to corporate structures where *both* corporations—i.e. both the parent and the subsidiary—were subject to the taxing power of New York.

The 1920 law was substantially changed by 1925 N.Y. Laws c. 322, § 1. The 1925 law made it explicit that the consolidated report provision could be implemented where the parent corporation was subject to the taxing power of New York even where the subsidiary was not. It also added the following provision: "In case it

[2] N.Y. Tax Law § 211 (4) (Consol. 1990) now provides, in relevant part that: "In the discretion of the commissioner of taxation and finance, any taxpayer, which owns or controls either directly or indirectly substantially all the capital stock of one or more other corporations, or substantially all the capital stock of which is owned or controlled either directly or indirectly by one or more other corporations or by interests which own or control either directly or indirectly substantially all the capital stock of one or more other corporations, may be required or permitted to make a report on a combined basis covering any such other corporations and setting forth such information as the commissioner may require; provided . . . that no combined report covering any corporation not a taxpayer shall be required unless the commissioner deems such a report necessary, because of inter-company transactions or some agreement, understanding, arrangement or transactions referred to in subdivision five of this section, in order properly to reflect the tax liability under this article."

shall appear to the tax commission that any arrangement exists in such a manner as to improperly reflect the business done, the segregable assets or the entire net income earned from business done in this state, the tax commission is authorized and empowered, in such manner as it may determine, to equitably adjust the tax and to eliminate any assets included in the segregations thereof, provided only that any income directly traceable thereto be also excluded from entire net income."

This provision was again substantially modified by 1944 N.Y. Laws c. 415, § 2. It is the 1944 law that created the present language both of N.Y. Tax Law § 211 (4) and (5) and of Connecticut General Statutes § 12-226a. The 1944 law created a new, highly detailed article governing the New York franchise tax on business corporations. Two subsections of that article are relevant here. Section 211 (4) provided, in relevant part, that: "In the discretion of the tax commission, any taxpayer, which owns or controls either directly or indirectly substantially all the capital stock of one or more other corporations . . . may be required or permitted to make a report on a consolidated basis covering any of such other corporations and setting forth such information as the tax commission may require . . . provided, however, that no consolidated report covering any corporation not a taxpayer shall be required unless the tax commission deems such a report necessary, because of inter-company transactions or some agreement, understanding, arrangement or transaction referred to in subdivision five of this section, in order properly to reflect the tax liability under this article."

Section 211 (5) provided, in relevant part, that: "In case it shall appear to the tax commission that any agreement, understanding or arrangement exists between the taxpayer and any other corporation or any

person or firm, whereby the activity, business, income or capital of the taxpayer within the state is improperly or inaccurately reflected, the tax commission is authorized and empowered, in its discretion and in such manner as it may determine, to adjust items of income, deductions and capital, and to eliminate assets in computing any allocation percentage provided only that any income directly traceable thereto be also excluded from entire net income, so as equitably to determine the tax."

The first significant case to construe § 211 (4) and (5) was *Wurlitzer Co. v. State Tax Commission,* 35 N.Y.2d 100, 315 N.E.2d 805 (1974). Wurlitzer was a foreign corporation doing business in New York. It had formed the Wurlitzer Acceptance Corporation, a foreign corporation not doing business in New York, for the sole purpose of providing financing to Wurlitzer by purchasing its accounts receivable. The Acceptance Corporation had no employees of its own and was essentially a shell corporation. The New York state tax commission's requirement of a combined report was upheld by the Court of Appeals. Wurlitzer argued that, under § 211 (4) and (5), transactions between related corporations had to be unfair in order for a combined report to be ordered. The court, pointing to the disjunctive language in the statute, disagreed. Id., 105. "Neither in the statute nor the regulations promulgated under it, is there any requirement of 'unfairness' in transactions between affiliated corporations." Id.

The New York Court of Appeals gave the New York state tax commission even more leeway in *Campbell Sales Co. v. New York State Tax Commission,* 68 N.Y.2d 617, 496 N.E.2d 213 (1986), cert. denied, 479 U.S. 1088, 107 S. Ct. 1295, 94 L. Ed. 2d 151 (1987). *Campbell,* in contrast to *Wurlitzer,* did not involve a shell corporation. The Campbell Sales Company, which did business in New York, was a subsidiary of Camp-

bell Soup Company, which did not. The sales company acted as a sales representative for the soup company, but it operated autonomously, with its own employees and facilities. See id., 623 (Kaye, J., dissenting). The majority of the Court of Appeals viewed this distinction as unimportant. To the majority, the crucial factor was that the decision of the state tax commission was "rational." Id., 620. It was sufficient that the corporations had "substantial intercompany transactions, which demonstrate that they have a symbiotic relationship to each other and that [the sales company] is a vital link in the over-all enterprise." Id.

In light of *Campbell,* it is clear that the New York courts have given the state tax commission wide discretion under § 211 (4) and (5) and that the decisions of the commission will be upheld if they have a rational basis. This standard is similar to previous lower court precedent in New York, which had held that the decisions of the state tax commission under § 211 (4) are reviewable only by an abuse of discretion standard. See *Sapolin Paints, Inc.* v. *Tully,* 55 App. Div. 2d 759, 761, 390 N.Y.S.2d 220 (1976), modified on other grounds, 44 N.Y.2d 865, 379 N.E.2d 220 (1978); *Matter of Fedders Corp.* v. *Tax Commission,* 45 App. Div. 2d 359, 362, 357 N.Y.S.2d 719 (1974).

Trans-Lux acknowledges the New York heritage of § 12-226a but attempts to distinguish the New York precedent just discussed by pointing out that that precedent is primarily based on § 211 (4). Although the Connecticut legislature adopted § 211 (5) in drafting General Statutes § 12-226a, Trans-Lux asserts, the legislature chose not to adopt § 211 (4). Thus, Trans-Lux reasons, the Connecticut legislature chose not to give the Connecticut commissioner of revenue services the complete arsenal of statutory weapons available to the New York state tax commission.

Trans-Lux's argument is not without persuasive force. In adopting § 211 (5), but not § 211 (4), it is obvious that the legislature, to the extent that it thought about the problem at all, chose not to adopt all of the statutory devices available to the New York state tax commission. But to recognize this fact is only to begin the necessary analysis. The crucial question is, what does § 211 (4) provide that § 211 (5) does not? The distinction between the two subsections was nicely summarized by Judge Jones dissenting in the *Wurlitzer* case. "[S]ubdivision 5 . . . authorize[s] corrective adjustment of individual items by reallocation of income and deductions; subdivision 4 authorize[s] a consolidated return where the number or complexity of unfair individual items [makes] the use of subdivision 5 inappropriate." *Wurlitzer Co.* v. *State Tax Commissioner,* supra, 35 N.Y.2d 110–11. While the majority in *Wurlitzer* disagreed with Judge Jones that an item had to be "unfair" to be adjusted, it did not disagree with him on the conceptual distinction between the two subsections. While the difference between the subsections, thus defined, might be of importance in some cases, it is not important here, since only a single item of Trans-Lux's income has been adjusted.

The broad, discretionary view that New York courts take of § 211 (4) and (5) is similar to that taken by the federal courts in construing the somewhat analogous provision of 26 U.S.C. § 482, which, in the case of controlled corporations, allows the secretary of the treasury to "distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations . . . if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations." This statute is, comparatively speaking, more restrictive than the Connecticut or New York statutes just considered and had

less discretionary language. Yet, the federal courts have held that the commissioner of internal revenue "has wide discretion under § 482 . . . unless the determination is shown to be arbitrary, capricious, or unreasonable." *Dolese* v. *Commissioner of Internal Revenue*, 811 F.2d 543, 546 (10th Cir. 1987); accord *Peck* v. *Commissioner of Internal Revenue*, 752 F.2d 469, 472 (9th Cir. 1985); cf. *Baker National Ins. Agency* v. *Montana Dept. of Revenue*, 571 P.2d 1156, 1160 (Mont. 1977) (reviewing determinations of the Montana department of revenue under Mont. Code Ann. § 84-1509 by an abuse of discretion standard).

Substantively, it is significant that courts of other jurisdictions reviewing statutes analogous to § 12-226a have rejected arguments that those statutes apply only in cases of tax evasion or other impropriety. Va. Code Ann. § 58.1-446 (1991), for example, provides that, "[i]n case it appears to the [Virginia] Department [of Taxation] that any arrangements exist in such a manner as improperly to reflect the business done or the Virginia taxable income earned from business done in this Commonwealth, the Department may, in such manner as it may determine, equitably adjust the tax." In *Commonwealth* v. *General Electric Co.*, 236 Va. 54, 65, 372 S.E.2d 599 (1988), the Supreme Court of Virginia rejected a taxpayer's argument that " 'improperly' connotes 'moral culpability, impropriety, or wrongdoing.' " Rather, the court explained, "[t]he adverb 'improperly' modifies the infinitive 'to reflect' and . . . makes no semblance of an antecedent reference to the word 'arrangement.' In the sense used in the provision, 'improperly' does not suggest fraud or wrongdoing. . . . Rather, the term as used in this context means 'not accordant with fact,' or 'inaccurate' or 'incorrect.' See Webster's Third New International Dictionary 1137 (1971)." Id.; cf. *Joslin Dry Goods Co.* v. *Dolan*,

615 P.2d 16, 19 (Colo. 1980) (holding tax evasion unnecessary to combine income under Colo. Rev. Stat. § 39-22-303 [5]).

With this authority in mind it is appropriate to return to § 12-226a. The statute, as explained above, is riddled with discretionary language. New York and federal judicial authority confirm what is manifest from the statutory text alone: the commissioner has wide discretionary powers under the act. It inexorably follows from this, as well as from general principles of administrative law, that the controlling question on judicial review is whether the commissioner "has acted arbitrarily or illegally or so unreasonably as to have abused [his] discretion." *First National Bank & Trust Co.* v. *Zoning Board of Appeals,* 126 Conn. 228, 237, 10 A.2d 691 (1940).

In making his decision, the commissioner is not prohibited from adjusting items of income between two corporations that are, for other purposes, separate taxable entities. See *Moline Properties* v. *commissioner,* 319 U.S. 436, 439, 63 S. Ct. 1132, 87 L. Ed. 499 (1943). Of course, if one of the corporations is a sham or fictitious corporation, the power of the commissioner to disregard that corporate entity would be clear beyond any dispute, but his powers are not limited to that situation. Nor, as the relevant authority from other jurisdictions confirms, is the commissioner's power limited to cases of fraud or tax evasion. Again, if fraud or tax evasion exist, the commissioner's adjustment powers are obvious, but the statute does not restrict his powers to those situations. All that is necessary to invoke those powers is a corporate arrangement that results in an improper or inaccurate reflection of income. And, given the statutory use of the disjunctive, an inaccurate reflection, without any trace of impropriety, is sufficient.

Turning to the facts of the present case, I see no grounds for concluding that the commissioner abused his discretion under the statute. T-L Investments and T-L Texas, while not sham corporations, were certainly shell corporations, entirely owned and controlled by Trans-Lux and with no officers or employees who were not also officers or employees of Trans-Lux. Moreover, the gain realized from the sale of the theater corporations was available for the use of Trans-Lux. Consequently, even though I find no fraud, tax evasion, or other impropriety on Trans-Lux's part, the commissioner was well within his powers in finding that an arrangement existed whereby Trans-Lux's income was inaccurately reflected. Section 12-226a was properly invoked.

## B

### SECTION 12-218

Because I find that § 12-226a was properly invoked, I must turn to the question of whether the income "adjusted" under that section was properly "apportioned" under General Statutes § 12-218. In contrast to § 12-226a, § 12-218 is an intricately detailed statute that leaves little room for discretion. Both parties concede that a single, relatively brief provision of § 12-218, concerning the sale of intangible assets, governs the tax consequences of the sale of the theater corporation stock here.

The general approach of § 12-218 was explained by the Connecticut Supreme Court in *Schlumberger Technology Corp.* v. *Dubno,* 202 Conn. 412, 415–16, 521 A.2d 569 (1987): "For a multistate corporation that is taxable 'both within and without this state,' the Connecticut corporate business tax is calculated by taxing the corporation, at current rates, upon the fraction of its entire net income that is apportioned to Connecticut in accordance with one of the formulae set out in Gen-

eral Statutes § 12-218. The choice of the appropriate apportionment formula depends, under § 12-218, on the nature of the taxpayer's business. . . . The net income of a § 12-218 (b) taxpayer, whose income is 'derived from the manufacture, sale or use of tangible personal or real property,' is apportioned by a three factor formula taking into account not only gross receipts but also property and payroll in this state and elsewhere." The question presented here involves the receipts factor. Section 12-218 specifically provides that this factor includes "net gains from the sale or other disposition of intangible assets managed or controlled within the state."

This statutory provision, which, as mentioned, both parties concede to be controlling here, has been augmented by regulation. Section 12-218-1 (e) of the Regulations of Connecticut State Agencies provides that: "Interest income and intangible assets are 'managed or controlled' by a company within this state if—(1) an office separate and distinct (if applicable) from the principal place of business of such company and officers of such company, charged with or responsible for the administration of, and the routine corporate activities involving, this particular aspect (interest income and intangible assets) of business operations are within this state; or (2) no such separate and distinct office (as described in subdivision [1]) exists within or without this state, but the principal place of business of such company is within this state."

Section 12-218-1 (d) of the Regulations of Connecticut State Agencies provides that: "The 'principal place of business' of a company is deemed to be within this state if the nerve center from which its officers control and coordinate corporate activities in furtherance of corporate objectives is within this state, or if the location of its overall, active management is within this state."

When these tests are applied to the facts of this case, a considerable potential for confusion exists at the outset because more than one corporation is involved. Is the "company" referred to by the regulation the parent corporation (i.e., Trans-Lux) or one of the subsidiary corporations (i.e., T-L Investment or T-L Texas)? These questions arise because § 12-226a has been invoked in addition to § 12-218. When the statutes are read closely, however, the answer to this initial question becomes clear. Trans-Lux has had its income "adjusted" under § 12-226a by the inclusion of an item of income from T-L Texas. It is the income of Trans-Lux, thus adjusted, that is subject to apportionment under § 12-218. Consequently, it is Trans-Lux, and not one of its subsidiaries, that must be examined under the standards set forth in § 12-218 and its accompanying regulation.

A second potential for confusion exists in this case because Trans-Lux not only conducted activities in different states but conducted different types of activities in those states. Trans-Lux has spent much effort in describing its various activities in New York, but it must now be asked whether those activities, colorful as they may be, are relevant for purposes of the standards that have been identified above.

It is helpful to begin with the words of § 12-218 itself. The statute includes in the receipts factor "net gains from the sale or other disposition of intangible assets managed or controlled within the state." What is it, under the statute, that must be "managed and controlled within the state"? The answer is clear from the statutory text that it is the "intangible assets" themselves. If, according to the statute, the intangible assets are managed or controlled within the state, it is irrelevant that other business—regardless of the overall importance of that business—is conducted by the company without the state.

In the present case, the intangible assets sold consisted of the stock of the individual theater corporations. Given this fact, it is irrelevant, under the statute, that the day-to-day business of running the theater corporations—e.g. the business of selecting motion pictures to be shown and negotiating their sale or lease—was conducted in New York. The question is, who managed or controlled the *stock*? It is entirely clear from the evidence that the employees who screened the films, for example, in New York had nothing to do with managing or controlling the stock. The persons who managed or controlled the stock were Mr. Brandt and, perhaps, a few other top officers and directors. These persons—the real managers and controllers for statutory purposes—performed their managing and controlling functions in both Connecticut and New York, but it is clear from the evidence that this activity predominately occurred in Connecticut. Not only was the actual board meeting that authorized the sale of the theater corporation stock held in Connecticut, but it is clear from the evidence that the headquarters of Trans-Lux were in Connecticut and that at least the bulk of the decisions conerning the management and control of the stock were made in Connecticut.

The analysis becomes more complex, however, when one turns to the regulation. The regulation—which both parties concede is controlling here—turns from the exclusive statutory focus on management and control of the intangible assets themselves to a broader consideration of a number of alternative factors, at least some of which involve the day-to-day business of the corporation.

The regulation presents a series of analytical choices. The initial choice to be made is whether one looks for the corporation's "principal place of business" or a "separate and distinct" office responsible for the "routine corporate activities" involving the particular intan-

gible assets in question. Section 12-218-1 (e) (1) and (2). In this case, the intangible assets in question consisted of the theater corporation stock, and there is no evidence that any "separate and distinct" office responsible for the "routine corporate activities" involving that stock existed. It is, consequently, necessary to inquire whether Trans-Lux had a "principal place of business" within the state.

The term "principal place of business" does not appear in the statute. Our Supreme Court defined the term at an early date as the place "where the governing power of the corporation is exercised"; *Middletown Ferry Co.* v. *Middletown,* 40 Conn. 65, 70 (1873); but this is not the precise test of the regulation. The term "principal place of business" is defined by the regulation by two alternative tests. The first test looks to the "nerve center" of corporate activities. The second test looks to the location of the corporation's "overall, active management." These tests will be considered in turn.

The regulation's "nerve center" test is a test initially articulated by the federal courts for use in determining whether or not those courts have diversity jurisdiction in cases involving multistate corporations. Under 28 U.S.C. § 1332 (a) (1) the federal courts have jurisdiction of civil actions where the matter in controversy exceeds $50,000 and is between "citizens of different States." For purposes of this statute, Congress has declared that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . ." 28 U.S.C. § 1332 (c) (1). In *Scot Typewriter Co.* v. *Underwood Corp.,* 170 F. Sup. 862, 865 (S.D.N.Y. 1959), the court stated that, "[w]here a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which

its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective."

The nerve center test has the virtue of being "a pleasant and alluring figure of speech." *Kelly* v. *United States Steel Corp.*, 284 F.2d 850, 853 (3d Cir. 1960). As *Scot* recognized, however, it is most appropriate for a corporation "engaged in far-flung and varied activites which are carried on in different states." *Scot Typewriter Co.* v. *Underwood Corp.*, supra, 170 F. Sup. 865. The Underwood Corporation (the corporation at issue in *Scot*), for example, had three manufacturing plants in as many states, branch offices in over one hundred cities throughout the United States, and an international business carried on through subsidiaries. Id., 864. "With activities so dispersed, there is no single state in which activities dominate so as to justify the label 'principal.' " 1 J. Moore, Moore's Federal Practice (2d Ed. 1993) ¶0.77 [3.-2], p. 800.108. For much the same reason, the nerve center test may be appropriate for a pure holding company. See *Topp* v. *Compair Inc.*, 814 F.2d 830, 834 (1st Cir. 1987). But, since it was first enunciated in *Scot,* the nerve center test has been largely limited to these contexts. See *J.A. Olson Co.* v. *Winona,* 818 F.2d 401, 407 (5th Cir. 1987). "The 'nerve center' test should be used only when no state contains a substantial predominance of the corporation's business activities." *Industrial Tectonics, Inc.* v. *Aero Alloy,* 912 F.2d 1090, 1094 (9th Cir. 1990). To use that test in relation to Trans-Lux, which conducts substantial business in New York and Connecticut but cannot be considered "far-flung" in the sense that the Underwood Corporation was far-flung, is to use the test in a context for which it was never designed. I conclude that the nerve center test is inapplicable in this case.

If a federal court were to analyze Trans-Lux for purposes of determining the presence or absence of diversity jurisdiction, it would go on to consider "the place where the corporate activities or operations are carried out." 1 Moore, supra, ¶0.77 [3.-3], p. 800.111; see *Kelly* v. *United States Steel Corp.*, supra, 284 F.2d 850; *Inland Rubber Corp.* v. *Triple A Tire Service, Inc.*, 220 F. Sup. 490 (S.D.N.Y. 1963). The purpose of diversity jurisdiction, however, is to provide a neutral federal forum for cases between citizens of different states. "In ascribing citizenship to a corporation, therefore, the court faces the ultimate task of determining whether the entity corporation is so closely tied to a particular state that it should not be permitted to sue (or be sued by) a citizen of that state in federal court." 1 J. Moore, supra, ¶0.77 [3.-4] p. 800.116-17. It is thus important for diversity purposes that "a corporation usually has its greatest contacts with the public where it conducts most of its business, rather than where internal policy decisions are made." *Industrial Tectonics, Inc.* v. *Aero Alloy,* supra, 912 F.2d 1094. This is not the purpose behind the apportionment provisions of General Statutes § 12-218. "The need to divide the tax base springs from the existence of competing claims of the jurisdictions in which businesses conduct activities, own property or derive income, and from which they obtain the benefits and protection of the States' markets, their public services, and their legal and other institutions." 1 J. Hellerstein & W. Hellerstein, supra, ¶8.01, p. 8-4. The regulation in question here, consequently, focuses on the location of the corporation's management rather than the site of its operations.

The alternative to the nerve center test under § 12-218-1 (d) of the Regulations of Connecticut State Agencies is a test that looks to "the location of [the corporation's] overall, active management." Because the nerve center test is inapplicable, it is this latter test

that is controlling in this case. While there is no body of jurisprudence, comparable to that which exists concerning the nerve center test, to guide me on the meaning of this test, the text of the regulation is plain enough.

The most important question to be answered when considering the phrase "overall, active management" is "management of what?" Is it management of the corporation at the highest level or is it management of the corporation at the level of its day-to-day activities? The answer to this question is provided by the word "overall." This refers not to day-to-day corporate affairs but to corporate affairs "as a whole." Webster's Third New International Dictionary (1966). It follows that the "overall, active management" test looks to the management of the entire corporation. In a corporation that conducts its day-to-day activities in more than one state, this test necessarily looks to management at the highest, corporate-wide level.

In the case of Trans-Lux, it is reasonably clear that the location of its "overall, active management" was in Connecticut at the time of the sale in question. The fact that most of the meetings of the board of directors occurred in Connecticut is one factor that must be considered. This is not, of course, a determinative factor, since boards of directors can usually meet where they please. "One can easily picture a peripatetic board which holds its meetings in some spot where the climate is favorable and recreational opportunities abound." *Kelly* v. *United States Steel Corp.*, supra, 284 F.2d 852. It is clear from the evidence in this case, however, that the undoubted salubrious qualities of Norwalk, Connecticut, played no role in the board's decision to meet in that fair city. Rather, the evidence is overwhelming that Norwalk was chosen as a site for the board meetings because that was the site of the corporate headquarters. The active management of the corporation

at its highest level was located in Connecticut. And at least most of the corporate decisions with respect to the sale of the theater corporation stock were made in Connecticut. I conclude that the "principal place of business" of Trans-Lux was in Connecticut, and that the commissioner's apportionment of the gain from the sale of the stock to Connecticut was correct.

## IV

### CONCLUSION

For the reasons stated above, the appeal is dismissed.