[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
For the tax years ending June 30, 1990 and June 30, 1991, the Commissioner of Revenue Services ("Commissioner") disallowed an interest deduction on loans made from a wholly owned subsidiary, Carpenter Investments, Inc. ("CII") to the plaintiff, Carpenter Technology Corporation ("Carpenter"), on the basis that CII was a sham and the transactions at issue between Carpenter and CII had no economic substance. Carpenter appeals pursuant to General Statutes § 12-237
the Commissioner's deficiency assessment of corporation business tax imposed on Carpenter as a result of the disallowance of the interest deduction. The two related issues in this tax appeal are first; whether the Commissioner properly disallowed the interest deduction because there was no economic substance to the loans from CII to Carpenter, and second; whether the Commissioner properly exercised his discretion under General Statutes § 12-226a by viewing CII's income and expenses as CT Page 10460 those of Carpenter and treating the two corporations as a single entity for tax purposes, essentially nullifying the interest expense deduction.
The following facts were either stipulated to by the parties or found by the court. Carpenter is a Delaware corporation primarily engaged in the business of manufacturing and distributing specialty steel and titanium products. Business was slow in the 1980's and Carpenter felt the need to develop new products and expand globally. Carpenter decided to target three areas for development: Mexico, Europe and the Pacific rim countries. The products that Carpenter sought to manufacture and sell overseas were components that would be used in products considered high product liability risks such as surgical equipment, surgical implants (such as hip joint prostheses, bone plates and heart catheter wire), laser systems, petrochemical storage and processing equipment, landing gear for carrier based jet aircraft, automobile airbags, automobile anti-lock brakes, automobile fuel injection systems, aircraft engines and nuclear reactors.
During the 1980's and 1990's, Carpenter expanded its business into foreign countries through the formation and acquisition of subsidiary corporations and joint ventures organized under the laws of the foreign countries. Carpenter's management was concerned about puffing all of the company's assets at risk when selling its products in the foreign market. These concerns included no limitations on damage awards in some countries, and potential personal liability of individual shareholders and corporate officers in third world countries. In general, Carpenter needed a liability shield to protect the parent corporation. With this in mind, Carpenter's management incorporated CII in Delaware as a domestic wholly owned subsidiary. CII had twelve employees, with its office and assets located in Delaware. CII's board of directors and officers met and did business in Delaware. CII paid rent for its office space, paid Delaware tax, filed it federal tax return and paid federal income taxes. Following its incorporation, CII set. up foreign subsidiary corporations in the foreign countries. It was the belief of the management of Carpenter that CII would effectively be a shield for Carpenter's domestic business assets from liabilities related to conducting business in foreign countries.
CII was incorporated by Carpenter in 1989 with a capitalization of $300,005,000 contributed by Carpenter in five payments over a four month period. Within days of CII's receipt of each of the capitalization payments, CII loaned a total of $300,000,000 back to Carpenter. The loan from CII to Carpenter was structured as a commercial loan in which Carpenter was required to make periodic interest payments to CII based upon an interest rate of 2% over the prime rate for corporate loans from large U.S. commercial banks as quoted in the Wall Street Journal on the CT Page 10461 second Friday of July of each year. Carpenter was not required to make any principal payments during the tax years of 1990 and 1991; however, Carpenter did make timely interest payments to CII pursuant to the terms of the note for the 1990 and 1991 tax years.
CII did not conduct any business in Connecticut, nor did it own or lease any tangible personal property in Connecticut, during the tax years in question. Carpenter and its subsidiaries, including CII, filed federal consolidated income tax returns for the 1990 and 1991 tax years. Carpenter deducted the interest expense resulting from the loan from CII on Carpenter's federal and state tax returns. No adjustment was made by the IRS to the interest deductions taken by Carpenter on the CII loan.
The Commissioner conducted an audit of Carpenter's tax returns for the 1990 and 1991 tax years. On April 1, 1995, the Commissioner issued a notice of assessment of tax for $214,679 against Carpenter for the 1990 and 1991 tax years. The Commissioner disallowed the interest payment deductions from Carpenter to CII so that CII's federal taxable income was added to Carpenter's Connecticut net income for, the 1990 and 1991 tax years. This disallowance resulted in an increase in Carpenter's tax of $196,102 for the two years in issue ($89,124 for 1990 and $106,978 for 1991).
The Commissioner's position is that CII was formed solely for the purpose of allowing Carpenter to take an interest deduction on its own money. The Commissioner views the passage of $300,005,000 to CII by Carpenter and the immediate return to Carpenter of $300,000,000 structured as a loan, to be nothing less than a sham. The Commissioner argues that Carpenter did not need to create CII as a shield from liability claims from the sales in foreign countries to foreign customers-because Carpenter could have protected itself with insurance. Whether Carpenter could have been protected adequately by insurance is a business decision that we will not judge. There is no evidence to support the Commissioner's claim that insurance would be an adequate protection for Carpenter.[1]
The Commissioner claims that the loans and subsequent payment of interest by Carpenter to CII were transactions lacking economic substance. The Commissioner does not see CII as a separate and viable corporation, but rather, sees Carpenter and CII as one and the same. The Commissioner sees no economic sense in having Carpenter give $300,005,000 to CII and immediately taking the money back in the form of a loan. What the Commissioner fails to see is that Carpenter paid CII interest payments on $300,000,000 at commercially acceptable rates in 1990 and in 1991. CT Page 10462
From the facts that have been stipulated to and from the facts that we have found, CII was formed for a legitimate business purpose. CII was properly organized with employees, officers, and a board of directors. It paid salaries, taxes, rent and other corporate expenses. CII was no sham. We note that the business interest deduction taken on the federal tax returns by Carpenter was not contested by the IRS. We find that the Commissioner erred in disallowing the interest deduction on the ground that the loans had no economic substance.
The Commissioner argues that he has the power under General Statutes § 12-226a to disallow the interest deduction taken by Carpenter because Carpenter's income was inaccurately reflected due to the arrangement between Carpenter and CII. Section 12-226a provides discretion to the Commissioner to "adjust items of income, deductions and capital, and to eliminate assets in computing any apportionment percentage under this chapter" if his conclusion is based upon a finding that "any agreement, understanding or arrangement exists between the taxpayer and any other corporation or any person or firm, whereby the activity, business, income or capital of the taxpayer within the state is improperly or inaccurately reflected." In this case, the Commissioner claims that the loans from CII to Carpenter were an arrangement that caused Carpenter's income to be inaccurately reflected since the "transactions were not loans to be respected for tax purposes as they lack economic substance, "and they "were nothing more than circular transactions, all within the Carpenter corporate structure." (Defendant's brief, p. 15.) As stated above, we find nothing improper or inaccurately reflected with the loans. Loans are "identified by the mutual understanding between the borrower and lender of the obligation to repay and a bonafide intent on the borrower's part to repay the acquired funds." Collins v. C.I.R., 3 F.3d 625, 631 (2nd Cir. 1993). Certainly, Carpenter had the assets to repay the $300,000,000 loan from CII, and there is no evidence that Carpenter intended to avoid the repayment of the loan.
Although the Commissioner argues that SLI International Corp. v.Crystal, 236 Conn. 156, 671 A.2d 813 (1996), is not applicable to this case because it deals only with a Foreign Sales Corporation (FSC), we disagree. The issue in SLI was whether the FSC was a viable corporation with economic substance rather than a sham. the Supreme Court held that, under the stipulated facts of the case, the FSC was not a mere paper corporation because it was formed according to federal requirements which obligated the corporation to maintain a place of business, employ a staff, maintain books and perform other corporate functions which generate necessary expenses. Id., 168. The situation of CII is much stronger than that of the FSC in SLI. CII, as we have said, had all the corporate trappings. It had income from the interest earned on the loan CT Page 10463 to Carpenter. CII was the holding company for numerous foreign subsidiary corporations. It had employees and management. Clearly, CII was not a sham but rather a viable functioning corporation. It is no secret that Carpenter controlled CII as its wholly owned subsidiary. However, by contributing the $300,005,000 of capital to CII as an asset of the corporation, the $300,005,000 became subject to the claims of creditors of CII. In this sense, the $300,005,000 capitalization fulfilled the objective of Carpenter to form a domestic corporation which had economic substance and could withstand claims of creditors of CII.
The Commissioner relies on Trans-Lux Corp. v. Meehan, 43 Conn. Sup. 314,331, 652 A.2d 539 (1993), in which Judge Blue construed the meaning of § 12-226a, concluding that "[all] that is necessary to invoke those powers [in § 12-226a] is a corporate arrangement that results in an improper or inaccurate reflection of income. And, given the statutory use of the disjunctive, an inaccurate reflection, without any trace of impropriety, is sufficient." We disagree with the Commissioner that he has unfettered discretionary powers under § 12-226a. When the issue is a question of law, no deference is given to the Commissioner's actions. SLI International Corp. v. Crystal, supra, 236 Conn. at 170-71. The question of law in this case is whether the relationship between Carpenter and CII, and the transactions between them, were legitimate business arrangements. We find that this "arrangement, which has economic purpose and reflects an arm's length relationship, does not warrant an adjustment under § 12-226a" as a matter of law. Id., 176.
In conclusion, we find that the loans from CII to Carpenter had economic substance and a business purpose. We further find that the Commissioner's exercise of his discretion under § 12-226a to make the adjustment at issue in this case was unreasonable in that the corporate arrangement between. Carpenter and CII did not result in an improper or inaccurate reflection of income. Accordingly, we sustain the plaintiffs appeal. Judgment may enter in favor of the plaintiff without costs. The Commissioner is ordered to refund to the plaintiff any tax and interest it may have already paid[2] as a result of the deficiency assessment based on the disallowance of the interest deduction, with interest pursuant to General Statutes § 12-237.
ARONSON, J.T.R.